NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |
| KENYA WILLIAMS, Jr., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil No. 17-7482 (RBK/JS) |
| v. | : | |
| | : | **OPINION** |
| LENAPE BOARD OF EDUCATION, *et al.*, | : | |
| | : | |
| | : | |
| Defendants. | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court on the Motion for Summary Judgment (Doc. No. 64) filed by Defendants Lenape Board of Education (the "Board"), Carol Birnbohm, Tony Cattani, and Timothy Walsh (collectively, "Defendants"). While a student at Lenape High School, Plaintiff Kenya Williams, Jr. ("Plaintiff"), an African-American, was a member of the football team. After earning varsity status during his sophomore season, Plaintiff expected to have an even larger role on the team during his junior year. He was doubly disappointed: not only were white players given playing time at his position instead of him, but white members of the football team began taunting Plaintiff and other African-American players with a variety of racial epithets, including the n-word. Plaintiff contends that when he and his parents brought these concerns to Lenape administrators, the administrators failed to adequately address the problem, and even began retaliating against Plaintiff through a series of disciplinary measures and by continuing to deny him playing time on the football team.

Plaintiff now seeks redress, bringing claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 *et seq*., Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, 42 U.S.C. § 1983, and state tort law for intentional infliction of emotional distress ("IIED"). For the reasons set forth below, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND[1]

Plaintiff is an African-American male and was a student at Lenape High School from 2013–2017. (Doc. No. 64-2 ("Def. SUMF") at ¶ 3). While at Lenape, Plaintiff was a member of the varsity football team during his sophomore year (2014–2015), junior year (2015–16), and senior year (2016–17). (*Id.* at ¶ 4). Defendant Lenape Board of Education is the board of education that oversees Lenape High School. (*Id.* at ¶ 7). At the time the relevant events occurred, Defendant Carol Birnbohm was the Superintendent of the Lenape Regional High School District; Defendant Tony Cattani was the Principal of Lenape High School; and Defendant Timothy Walsh was an Assistant Principal of Lenape High School and its Athletic Director. (*Id.* at ¶¶ 8–10). Additionally, Gary Noecker and William Murray were Assistant Principals and Anti-Bullying Specialists at Lenape High School;[2] Noecker also served as the school's Affirmative Action Officer. (Def. SUMF at ¶¶ 11–12). Finally, Timothy McAneney was the Head Coach of the Lenape High School football program. (*Id.* at ¶ 13).

This case centers on Plaintiff's experiences on the Lenape football team. The football team's offense ran out of a two running back set. (Doc. No. 67-3 at 53). In this scheme, one running

---

[1] The facts below are presented in the light most favorable to Plaintiff, as supported by the record. Needless to say, Defendants dispute much of Plaintiff's version of events, and their position is occasionally noted.

[2] Plaintiff contests the labelling of Noecker and Murray as "specialists," asserting that they did not receive sufficient training to be classified as experts. (Doc. No. 67-1 ("Pl. RSMF") at ¶¶ 11–12). However, there does not appear to be any dispute that Noecker and Murray held the title of "Anti-Bullying Specialist," regardless of whether they were properly qualified.

back, the "four back" or "slot back," lines up to the left or right of the quarterback. (*Id.* at 36, 53). The other running back, the "two back" or "tailback," lines up directly behind the quarterback. (*Id.*). Although Plaintiff was a four back, he was familiar with the two back position and could play there if necessary. (*Id.* at 53). Similarly, the team's starting two back was familiar with the four back position and could play there if necessary. (*Id.*).

J.K.[3] is African-American and was a student at Lenape High School during the relevant time period, one grade level behind Plaintiff. (Def. SUMF at ¶ 23; Doc. No. 64-4 at 8). According to Defendants, J.K. was the starting running back during the 2015 and 2016 seasons, with Plaintiff serving as J.K.'s backup. (Def. SUMF at ¶¶ 23, 28, 30; Doc. No. 64-4 at 11). J.K. is bigger than Plaintiff and Plaintiff concedes that he is "very talented," although Plaintiff recalls running a faster time at the combine than J.K. (Doc. No. 67-3 at 53).

Contrary to Defendants, Plaintiff maintains that J.K. was the team's two back, and that since he was a four back, he was not J.K.'s back-up. (Doc. No. 67-3 at 36, 53). Rather, Plaintiff claims that he competed with R.S. and J.T. for playing time at the four back position, and that these players started games and received playing time at his expense. (*Id.*). R.S. and J.T. are white. (Doc. No. 64-4 at 35).

In order to earn a varsity letter in football at Lenape High School, athletes must play in one half of the quarters of the varsity football games during the regular season. (Doc. No. 64-4 at 13). This requirement does not apply to Seniors, who are automatically awarded varsity letters. (*Id.*).

---

[3] Plaintiff chose to bring this lawsuit using his full name and is now an adult. As such, the Court sees no need to abbreviate his name, even though the events underlying this case took place when Plaintiff was a minor. However, any discussion of the facts of this case must reference the actions of numerous other students at Lenape High School who were minors when these events occurred and who are not parties to this lawsuit. Although these students are likely now adults, the Court believes it is still appropriate to abbreviate their names in order to protect their privacy.

During his sophomore year, Plaintiff earned a varsity letter for football. (Doc. No. 64-3 at 31). The events giving rise to this case began during Plaintiff's junior year.

**A.  Junior Year (2015–2016)**

Prior to the start of the 2015 football season, the Lenape football team held a series of intra-squad scrimmages. (Doc. No. 64-3 at 38–39). Plaintiff only participated on three plays during these scrimmages. (*Id.* at 39). When Plaintiff asked Coach McAneney why he did not get more playing time, McAneney told Plaintiff that it was because Plaintiff was not better than three other players on the team, including J.K and R.S. (*Id.* at 39–40). While Plaintiff played in every junior varsity game during the 2015 season, he only played in three or four varsity games, and only for three or four minutes per game he played in. (Doc. No. 64-3 at 35). At the end of the season, Plaintiff finished with twelve carries for forty-two yards, one touchdown, and zero receptions. (Def. SUMF at ¶ 27).

During the 2015 season, Plaintiff claims he experienced numerous instances of racial discrimination, harassment, and retaliation.

*i.  General Locker Room Harassment*

Throughout the 2015 season, Plaintiff and other African-American football players were called a variety of derogatory names by white members of the football team in the locker room. (Doc. No. 67-3 at 24). These names included "baby monk," "grease monk" "smelly monk," "grease monkey," "ape," and "nigger." (*Id.*; Doc. No. 67-4 at 5). Plaintiff did not understand that some of these terms were racial slurs until another African-American football player, J.D., told him that they were. (Doc. No. 67-3 at 25). J.D. complained to Coach McAneney, and McAneney had J.D. address the players on the issue. (*Id.*). While one perpetrator apologized for his use of racial slurs, the abuse continued. (*Id.* at 26).

Later in the season, after Plaintiff and his parents complained about racial discrimination on the football team, these players began calling Plaintiff "snitch Kenya." (Doc. No. 67-3 at 25–26). Plaintiff repeatedly complained to the coaches about the racial slurs and the name calling, but the coaches took no steps to address the issue. (*Id*. at 26). On October 27, 2015, Plaintiff's mother sent an email to Principal Cattani complaining about the racial harassment that Plaintiff was experiencing. (Doc. No. 67-6 at 82).

Another African-American player, S.K., was also called "nigger" in the locker room by white players, but he did not report these instances because he did not believe the coaching staff cared and because he believed they would deny him playing time in retaliation. (Doc. No. 67-4 at 10).

### ii. The Jersey Incident

At the beginning of the football season, it was customary for upperclassmen to receive their jerseys prior to underclassmen—seniors first, then juniors, etc. (Def. SUMF at ¶ 35). Plaintiff and another African-American football player, M.H., arrived on time at the place they were told to pick up their jerseys, but found that there were already sophomores in line ahead of him. (*Id*. ¶¶ 35–36; Doc. No. 67-4 at 51). Believing they had priority over the sophomores, Plaintiff and M.H. attempted to cut in front of them. (Doc. No. 67-4 at 51). However, Assistant Football Coach Mark Lilley told Plaintiff to go to the back of the line, causing Plaintiff and M.H. to be the last players to receive their jerseys. (*Id*. at 51–52). Plaintiff received jersey #65, while an underclassman received the number Plaintiff had his sophomore year, #8. (*Id.*).

Later in the day, one of the football coaches intervened, and the underclassman who had received jersey #8 agreed to switch jerseys with Plaintiff. (*Id.* at 52). Plaintiff continued to wear

the #8 jersey the rest of the 2015 season and also during the 2016 season. (Def. SUMF at ¶ 41). However, M.H. did not receive his desired jersey, and quit the team. (Doc. No. 67-4 at 52).

### iii. September 21, 2015 Parents Meeting

On September 20, 2015, Coach McAneney told Walsh that he had received a text message from Plaintiff's father, Kenya Williams, concerning racism within the varsity football program. (Doc. No. 64-4 at 26). In the message, Plaintiff's father complained about the lack of playing time for certain African-American football players, (Doc. No. 67-6 at 80); Plaintiff's mother, Florserido Williams, had observed that African-American players were not playing while white players were, (Doc. No. 67-4 at 67). Walsh told McAneney to schedule a meeting with Plaintiff's mother and father for Monday, September 21, 2015, to discuss their concerns. (Doc. No. 64-4 at 26).

Pursuant to this instruction, there was a meeting on September 21 between Lenape High School staff members and certain parents and grandparents of African-American football players. (Def. SUMF at ¶ 43). The Lenape staff members present at the meeting were Walsh, McAneney, Lilley, and Assistant Coach Chris Washington. (Doc. No. 64-4 at 26). The parents or grandparents of five football players attended the meeting, including Plaintiff's parents and the father of S.K. (Def. SUMF at ¶ 45; Doc. No. 64-4 at 26). Plaintiff attended as well, along with one other player, A.H. (Doc. No. 64-4 at 26).

At the meeting, the parents' main concern was stopping the racial abuse and harassment that was occurring in the locker room. (Doc. No. 67-4 at 16, 52). However, the Lenape staff members refused to address this concern, and tried to talk only about issues on the football field. (*Id.*). The parents did indicate that they believed their sons were getting inadequate playing time; they complained that white players received playing time regardless of skill level, while African-American players were played only when the team had a large lead or white players were injured.

(*Id.* at 16). McAneney belittled this concern. (*Id.*). In his incident report on the meeting, Walsh portrayed the parents as chiefly complaining about the lack of playing time for the African-American members of the football team. (Doc. No. 64-4 at 26).

In response to this meeting, Murray and Noecker led an investigation into the concerns raised by the parents. (Def. SUMF at ¶¶ 47–48). The investigation included interviewing Plaintiff, A.H., and M.H., and looking at data on the racial makeup of Lenape High School as a whole and the football team in particular. (Def. SUMF at ¶ 48). A.H., M.H., and Plaintiff provided the following statements to the investigators:

- A.H.: I don't feel that the coaches/teams is being racist toward any of the players who don't get playing time. It's about how you perform and those guys just aren't performing good enough. (Doc. No. 64-4 at 40).
- M.H.: I really didn't know if the coaches were racist or not, but there were two people in front of me, [M.D.] & [M.L.]. I knew I was way better than both of them and I was last to get my jersey, even after the freshmen went. I felt like no coaches really like me besides Hendricks. Other than that I really don't care for [sic] much for the sport anymore. (*Id.* at 41).
- Plaintiff: I just think I'm not getting a fair chance. When the starters get tired they all stay in and don't come out I don't know if race is a reason but I hope not and just want to be given a fair chance. (*Id.* at 42).

S.K.'s father did not allow Murray and Noecker to interview his sons. (*Id.* at 43). On October 5, 2015, the investigation results were issued with the following conclusions:

Statistics:

31/75=41% of the football roster are non-white
590/1759=33.5% of Lenape students are non-white
5/18=27.8% of starters are non-white (some players start offense and defense)

Based on the interviews and the data provided for this investigation, it is the conclusion of Mr. Murray and Mr. Noecker that playing time is not awarded based on the race of the player.

(*Id.* at 28).

     *iv.  Incident Between Plaintiff and T.S.*

One day at football practice, a white player, N.C., called S.K. a "nigger." (Doc. No. 67-4 at 6; Doc. No. 64-5 at 2–3). S.K. told Plaintiff, and Plaintiff tried to talk to N.C. about why using the n-word is inappropriate. (Doc. No. 67-4 at 6; Doc. No. 64-5 at 2–3). N.C. then told another white player, T.S., about Plaintiff's actions, leading T.S. to aggressively confront Plaintiff in the locker room by repeatedly calling him "nigger." (Doc. No. 67-4 at 6; Doc. No. 64-5 at 2–3; Doc. No. 67-3 at 37). T.S. is substantially larger than Plaintiff. (Doc. No. 67-3 at 74).

On October 22, 2015, Plaintiff filed a complaint regarding this incident. (Doc. No. 64-5 at 2–3). Murray and Noecker conducted a Harassment, Intimidation, or Bullying ("HIB") investigation into this complaint, interviewing twenty-three students, and found corroboration for Plaintiff's version of events, including that T.S. told Plaintiff "shut up you black nigger" repeatedly. (Doc. No. 64-5 at 7–8). As such, they recommended a three-day in-school suspension for T.S, which was issued. (*Id.*). On November 24, 2015, Superintendent Birnbohm sent Plaintiff's parents a letter that stated:

> As a result of [Murray and Noecker's] investigation, including multiple interviews of witnesses, it was determined that T.S. made harassing comments to your son in the locker room after football practice. Based upon that investigation, the Administration and Anti-Bullying Specialist have concluded that the incident constituted HIB as that term is termed by the Anti-Bullying Rights Act and Board Policy 5760. I concur with both the findings and the recommendation of the Administration and the Anti-Bullying Specialist.
>
> As a result of the above investigation and finding confirming an incident of HIB occurred, the following intervention services were provided to [Plaintiff]; [Plaintiff] was offered individual school counseling; provided with a shadow; extra supervision was provided in the locker room, and appropriate action was taken to ensure that [Plaintiff] and T.S. are not in any classes together. In addition, appropriate disciplinary measures and intervention services were implemented for T.S.

(*Id.* at 5).

Plaintiff was provided with a "shadow," a Lenape security guard who followed Plaintiff around campus, observing him from a distance. (Doc. No. 67-3 at 42–43). The shadow remained in place for at least a few weeks, although eventually Plaintiff requested his removal. (*Id.*). However, Plaintiff was never provided with counseling services. (*Id.* at 40). Further, T.S. was in Plaintiff's English class during their senior year. (*Id.* at 44).

### v.   Incident Between Plaintiff and A.S. on Snapchat

On October 24, 2015, Plaintiff complained that A.S., a white football player, "snapchatted me say Baby Monk on Saturday." (Doc. No. 64-5 at 13; Doc. No. 64-5 at 35). Murray and Noecker investigated the complaint. (Def. SUMF at ¶ 55). During the investigation, Murray and Noecker learned that there were instances of racial slurs being used in the locker room, both between players of the same race and across races. (Doc. No. 64-5 at 18). According the report, these slurs included "big monk," "baby monk," and "grease monkey." (*Id.*). Murray did not consider the possibility that the African-American players were using the terms defensively after being called these names by white players. (Doc. No. 67-3 at 102–03). T.S. submitted a statement to Murray and Noecker that "the 'N' word is used as a friendly statement" in the locker room." (Doc. No. 67-3 at 13). S.K. also complained to Noecker that another white player had called him a "black nigger." (*Id.* at 84).

On October 28, 2015, Murray and Noecker sent their preliminary conclusions to other Lenape officials, including Walsh and Cattani, and submitted their final HIB investigation report on November 2, 2015. (Doc. No. 64-5 at 11, 18). Murray and Noecker found that the players did not intend to demean each other by using these terms and did not view these comments as discriminatory, and consequently did not find evidence of HIB. (Doc. No. 64-5 at 18). Additionally, they concluded that "[a]lthough there were indications of racial jokes, name-calling and horseplay, reports indicate that the locker room atmosphere was comfortable and non-

offensive." (*Id.* at 11, 18). Nevertheless, they did find evidence of inappropriate behavior by A.S., and recommended a two-day suspension. (*Id.* at 11).

On November 24, 2015, Superintendent Birnbohm sent a letter to Plaintiff's parents summarizing the results of the investigation. (*Id.* at 15). This letter stated:

> As a result of the investigation, including interviews of several witnesses and reviewing social media posts by [Plaintiff] and A.S., it was determined that A.S.'s posts on Snapchat were not harassing, intimidating or bullying . . . . and did not constitute HIB as that term is defined by the Anti-Bullying Bill of Rights and Board Policy 5760. I concur with the findings and recommendations of the Administration and the Anti-Bullying Specialist.
>
> However, even though HIB was not found, education for the football team was provided from an outside professional on treating each other respectfully and using appropriate language.

(*Id.* at 15).

The "outside professional" referenced in the letter was Kevin Touhey. (Doc. No. 67-3 at 77). Touhey gave a presentation to the team every year about getting along. (*Id.*).

### vi. October 31, 2015 Bus Incident

On October 31, 2015, Assistant Football Coach Joe Wojceichowski sent an email to Walsh and McAneney reporting that Plaintiff had shouted the n-word on a bus, and that he had given Plaintiff a verbal reprimand. (Doc. No. 67-6 at 78). Plaintiff maintains that he did not use the n-word on this occasion. (Doc. No. 67-3 at 47).

### vii. November 4, 2015 and November 5, 2015 Locker Room Incident

On November 4, 2015, Plaintiff was unable to locate his cleats in his locker. (Doc. No. 64-5 at 20, 22–23). The next day, Plaintiff discovered his shoebox in the trash. (*Id.*). When has asked around about why his shoebox was in the trash, R.S. confronted Plaintiff and told him that his locker "was not your fucking locker anymore." (*Id.*). R.S. and other players tried to provoke Plaintiff into starting a fight, causing Assistant Coach Lilley to come into the locker room to break

10

up the commotion. (*Id.*). Plaintiff spoke with Lilley and Assistant Coach Hendricks, who assured him that he could continue to use his locker. (*Id.*). When Plaintiff came to practice on November 6, 2015, all of his belongings were in his locker. (*Id.*).

On November 9, 2015, Florserido Williams sent a complaint about this incident to Murray, and on November 12 Plaintiff also filed a complaint. Murray investigated these complaints and conveyed his findings to Plaintiff's parents in a November 16, 2015 letter:

> The result of the investigation revealed your son, [Plaintiff], vacated the varsity team room many days before the reported incident, leaving his teammates to believe he was no longer using the locker. His shoebox was discarded and the locker he was no longer using was given to a varsity athlete. It was also discovered that prior to practice, on Thursday, November 5, 2015, [Plaintiff] learned that the locker was given to another athlete. [Plaintiff] confronted Student A, after practice, in the locker room. Student B intervened and attempted to explain why the locker room was given to someone else. [Plaintiff] and Student B became involved in a verbal exchange.
>
> Two staff, supervising the locker room, intervened when they heard shouting. All parties were separated and questioned; [Plaintiff] was given back the locker he wanted to use. The parents of all involved were contacted and appropriate measures taken to ensure [Plaintiff] has access to the locker he wants to use for the remainder of the season.
>
> The Lenape administration will ensure locker assignments will be a responsibility of the coaching staff and not left up to the senior varsity athletes. Please encourage [Plaintiff] to immediately report any incidents to a member of the Lenape High School staff and members of the Lenape administration will ensure the matter is dealt with accordingly.

(*Id.* at 25).

> ### viii.   November 4, 2015 English Class Incident

On November 4, 2015, while in the school library, Plaintiff was using his phone prior to the start of class. (Doc. No. 67-3 at 29). Under Lenape's policy at the time, teachers had discretion over when students were allowed to use cell phones. (Doc. No. 67-5 at 17). Some teachers permitted students to use their phones prior to the start of class. (Doc No. 67-3 at 30). On this

occasion, numerous other students besides Plaintiff were using their phones. (*Id.*). Plaintiff's

English teacher, Andre Lopez, came up behind Plaintiff and took Plaintiff's phone, and then sent

Plaintiff to the school office. (*Id.* at 30). Plaintiff asked for his phone back, but Lopez refused.

(*Id.*). One student, C.J., protested Lopez's treatment of Plaintiff. (*Id.*). Another African-American

student was also sent to the office. (Doc. No. 67-5 at 35).[4]

> On November 13, 2015, the following report was filed regarding this incident:
>
> [Plaintiff] was asked to sit at assigned seat which he would not do. When he pulled
> out his phone, [Lopez] told him to put it away which he did not do. [Lopez] then
> saw him video taping another student. [Lopez] took it from his hand and gave him
> two options to get to work or go to the office. He just kept saying "Give me back
> my phone." "Not going anywhere without my phone." When Mr. Bausch came to
> help, [Plaintiff] was belligerent with him, saying under his breath, "Get the fuck
> out of my face." His belligerence continued until he was escorted out.

(Doc. No. 64-5 at 27). Plaintiff received a one day in-school suspension for his conduct that was

to be served on November 11, 2015. (*Id.*). The Incident Report lists Walsh as the administrator

overseeing the incident. (*Id.*). In addition to teaching English, Lopez also coached swimming and

golf. (Doc. No. 67-5 at 37). Walsh was Lopez's supervisor in his capacity as a coach. (*Id.*).

Plaintiff's parents protested the imposition of the in-school suspension, arriving at the

school on November 11 demanding to speaking with administrators. (Doc. No. 67-6 at 20). Several

administrators met with Plaintiff's parents. (*Id.*). During the meeting, a police officer stood in front

of the door to the room where the meeting was being held. (Doc. No. 67-4 at 81–82). On November

13, 2015, Cattani denied Plaintiff's parents' request to view security footage of the incident, on

the grounds that it would violate the confidentiality of the other students depicted therein. (*Id.* at

22).

---

[4] Plaintiff claims that this African-American student was M.H., and that he was sent to the office for sticking up for
Plaintiff. (Pl. RSMF at ¶ 61). He also claims that C.J. is white, and seems to suggest that Lopez treated M.H. and
C.J. differently on the basis of race. (*Id.*). But Plaintiff has not cited any evidence that supports these assertions, and
so the Court does not credit them.

### ix.   November 10, 2015 School Bus Incident

On November 10, 2015, the football team practiced at Moorestown's indoor field, requiring the players to catch a bus after school. (Def. SUMF at ¶ 63). Plaintiff and another African-American student, A.H., were not on the bus the football team took to Moorestown. (*Id.*). Plaintiff's "shadow," Sean Dooley, recorded the following events on November 10, 2015:

> 2:27–3:32[:] I shadowed [Plaintiff] from A102 to the boys North Gym locker room. On his way to football practice he met with [A.H.] in NB hall. [Plaintiff] then told me that I no longer needed to follow him (that he was at football practice now), before entering the NB boys bathroom with A.H. at 2:41. Both boys exited the bathroom 3:32 asking me if they had missed the bus to practice.

> 3:32–3:38[:] I shadowed the students from the NB boys bathroom to the North Gym boys locker room, then to the South Cafeteria holding area to wait for the late bus.

> 3:50–4:03[:] I shadowed [Plaintiff] from the South Cafeteria to bus LL6 until the bus left school grounds (both boys got on the same bus).

(Doc. No. 64-6 at 5).[5]

### x.   Lenape Football Banquet

At the end of football season, the Lenape football team holds a banquet for the players. (Def. SUMF at ¶ 72). The names of the football players are listed in the banquet program, with an asterisk by their name if they earned a varsity letter. (*Id.*). Further, the names of those earning varsity letters are announced at the banquet. (Doc. No. 67-3 at 32).

In preparation for the banquet, Coach McAneney reviews a copy of the football team roster, and then has one of the football coaches send that roster to the Parents' Club, which prints the programs. (Doc. No. 64-4 at 7–8).[6] However, McAneney is not always diligent in his review of

---

[5] While Plaintiff disputes Dooley's account, he has not cited to any evidence that contradicts it. (Pl. RSMF at ¶ 63). As such, pursuant to Local Civil Rule 56.1, Plaintiff is deemed to have admitted to Dooley's version of events for purposes of the present motion.

[6] Plaintiff appears to claim that Cattani was somehow involved in the preparation of the football banquet program, claiming he admitted as such at his deposition. (Pl. RSMF at ¶ 71). However, at his deposition, Cattani stated that the football staff is responsible for the banquet programs and did not indicate that he was involved in the process in any way. (Doc. No. 67-5 at 20).

the roster before sending it to the parents' club. (*Id.*). He does not review the program itself before it is printed. (*Id.* at 13).

At the 2015 banquet, there was no asterisk next to Plaintiff's name in the program, nor was his name announced. (Doc. No. 67-3 at 32). Additionally, there were no asterisks next to the names of N.A. or S.K, both of whom are African-American. (Doc. No. 67-6 at 10; Doc. No. 64-4 at 35).

## B.  Senior Year (2016–2017)

Plaintiff played on the football team during the 2016 season. (Def. SUMF at ¶ 28). After J.K. suffered an injury, Plaintiff started the first two games of the season at the running back position.[7] (*Id.* at ¶ 29). After J.K. recovered from his injury, he returned to his position as the starting running back. (*Id.*). On October 28, 2016, the football team held a Senior Night. (Def. SUMF at ¶ 31). Plaintiff was honored along with the rest of the seniors and escorted on the field by his parents and family friend Najah Parks. (*Id.*).

At some point during the 2016 season, Plaintiff told the coaches that he intended to take a knee during the national anthem at an upcoming football game. (Doc. 67-4 at 78). The coaches told Plaintiff that was fine. (*Id.*). However, before the game, the coaches held a team meeting where they told the players that if they took a knee during the national anthem, they would not play in the game. (*Id.*). As a result, Plaintiff did not take a knee during the playing of the national anthem. (*Id.*).

At the end of the 2016 football season, Plaintiff finished with 63 carries for 301 yards, 3 touchdowns, and 4 receptions for 33 yards. (Def. SUMF at ¶31). Plaintiff earned a varsity letter for his senior year, and his name was announced at the football team banquet. (Doc. No. 67-3 at

---

[7] It is unclear if Plaintiff was playing two back or four back.

32). During the 2016 season, white players continued to racially harass Plaintiff and other African-American players. (*Id.* at 24).

### i. *August 2016 Inter-squad Scrimmage*

During the 2016 pre-season, the Lenape football team held an inter-squad scrimmage. (Doc. No. 64-3 at 41). Initially, the team captains picked the teams for the scrimmage, and the teams were fairly evenly matched. (*Id.*). However, the coaches overrode the captains' selections, and changed the membership of the teams. (*Id.*). As a result of their changes, the defense of the team Plaintiff was going against featured numerous members of the starting defense. (*Id.* at 41–42). Plaintiff had two offensive line starters, J.S. and T.S., blocking for him. (*Id.* at 47). On one play, T.S. did not make his block, causing Plaintiff to try to make cut, resulting in him rolling his ankle. (Doc. No. 67-3 at 55). Plaintiff suffered a high and low ankle sprain and bruised bone. (Doc. No. 64-3 at 42).

### ii. *November 18, 2016 Team Meeting Incident*

During a November 18, 2016 team meeting, Plaintiff had a verbal disagreement with M.H. (Def. SUMF at ¶ 78). Plaintiff then approached N.A. and started arguing with N.A. about his disagreement with M.H. (*Id.*). Next, T.S. came over to Plaintiff and told him to "chill." (*Id.*). Plaintiff and T.S. got into a verbal disagreement, during which time T.S. called Plaintiff "nigger." (*Id.*). Coach Lilley broke up this disagreement, took Plaintiff into the hallway, and told him he would not play in the football game that night. (*Id.*).

Noecker investigated this incident and concluded the following:

> Four staff members and eighteen students were interviewed. They were asked to describe what they saw and heard. Most said they witnessed the verbal disagreement between [T.S.] and [Plaintiff] but couldn't say exactly what was said. I asked all students specifically if they heard the n word used. The all said they did not hear the n-word used.

(*Id.* at ¶ 78). On December 6, 2016 Noecker concluded his investigation. (Doc. No. 64-6 at 7). Noecker found that T.S did not make harassing or demeaning comments to Plaintiff, nor Plaintiff to T.S.; as such, he found the incident did not constitute HIB, and Birnbohm concurred. (Doc. No. 64-6 at 11). At no point was Noecker informed that Plaintiff believed the coaching staff was retaliating against him. (Doc. No. 67-3 at 82).

### iii.   November 22, 2016 Retaliation Complaint Against McAneney and Walsh

Subsequent to the November 18 incident, Coach McAneney suspended Plaintiff for five days from football activities. (Doc. No. 67-6 at 73). On November 22, 2016, Plaintiff filed the following complaint:

> I'm filling this HIB out because I feel like I'm being retaliation [sic] due to me being suspended from the team because Mr. Walsh and Coach [McAneney] I feel like they did it out of angry [sic] because my dad was getting them mad at the meeting we had yesterday 11/21/16.

(Doc. No. 64-6 at 13). Murray investigated Plaintiff's complaint by interviewing and taking written statements from Walsh and McAneney. (Doc. No. 64-6 at 17–18). Murray concluded the following:

> [McAneney] stated that he decided to suspend [Plaintiff] because of a combination of infractions. On 11/16/2016 [Plaintiff] had an unexcused absence from practice. On 11/18/2016 [Plaintiff] tried to start fights with teammates, used profanities and continued to curse after being told to stop repeatedly.
>
> HIB was not found because [Plaintiff] was suspended from the team by [McAneney] because of a combination of infractions. On 11/16/16 [Plaintiff] had an unexcused absence from practice. On 11/18/16 [Plaintiff] tried to start fights with teammates, used profanities and continued to curse after being told to stop repeatedly.

(*Id.* at 15). Birnbohm concurred in this finding. (Doc. No. 67-6 at 73).

### C.  S.K.'s Experience

S.K. played defensive line on the Lenape High School football team during the 2015 and 2016 seasons. (Doc. No. 67-4 at 7–8). However, he was never a starter, and the coaches played several white players ahead of him on the defensive line. (*Id.* at 8, 20). After the 2016 season, former New York Giant Antrel Rolle suggested to S.K.'s father that S.K. try out for the Offense Defense All-American Bowl Game, an all-star game for high school players who have not yet committed to play football for a particular college. (*Id.* at 9; Doc. No. 67-6 at 87). S.K. tried out and made the team. (Doc. No. 67-4 at 9). After playing defensive end in the bowl game, he was awarded the defensive MVP award. (*Id.*).

### D. Relevant Policies

Lenape Regional Board of Education Policy 5760 lays out the Board's policy on harassment, intimidation, and bullying. (Doc. No. 64-7 at 3). The Lenape Regional High School District also maintains policies and regulations with respect to its athletic programs and playing time. (Def. SUMF at ¶ 87; Doc. No. 64-8). The Student Athletic Handbook states that "[t]he athletic program was not developed to showcase individual talent for the purpose of expecting future financial assistance through athletic scholarships and/or professional contracts." (Doc. No. 64-8 at 4). Further, "playing time, level or position placement, team strategy and play calling are the sole responsibility of the coach." (*Id.* at 7). Finally, "[t]he head coach is to establish his own criteria for determining individual abilities and talents." (*Id.* at 12).

## II. PROCEDURAL HISTORY

On August 14, 2017, Plaintiff and his parents filed suit against Defendants, Kimberly Harrington, the Acting Commissioner of the New Jersey Department of Education, and the State of New Jersey. (Doc. No. 1 at 2). On September 26, Defendants timely removed the case to this Court. (*Id.*). Defendants filed Motions to Dismiss, (Doc. Nos. 5, 6, 9), which the Court granted in

part and denied in part, (Doc. Nos. 29, 30), such that all claims against the State Defendants were dismissed, all of Plaintiff's parents' claims were dismissed, and Plaintiff's claim under Article 1 of the New Jersey Constitution was dismissed.

Pursuant to the Court's Order, Plaintiff filed an Amended Complaint (Doc. No. 32) on March 2, 2018. The Amended Complaint contains five counts. Count I brings an NJLAD racial discrimination claim, while Count II brings an NJLAD retaliation claim. Count III asserts an IIED claim. Count IV is a Title VI racial discrimination claim, and Count V brings a claim under Section 1983. Plaintiff brings all of these claims against all Defendants.

Defendants moved for summary judgment on all of Plaintiffs' claims on November 1, 2019. Plaintiff filed an Opposition brief (Doc. No. 67 ("Pl. Brief")) [8] on December 23, 2019, and Defendants replied (Doc. No. 70) on January 29, 2020. Defendants' motion is now ripe for adjudication.

## III.   LEGAL STANDARD

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the

---

[8] The Court feels compelled to comment on the state of Plaintiff's briefing. To begin, Plaintiff's brief is extremely disorganized, vague, conclusory, and littered with typographical errors, all of which combine to make it very difficult to ascertain what Plaintiff's arguments actually are. Indeed, it is not clear if even Plaintiff knows—the brief contains an extended discussion of claims that are not referenced in the Amended Complaint. (Pl. Brief at 50–55). Next, Plaintiff's brief is not in compliance with the Local Civil Rules. Plaintiff's brief is forty-seven pages long, violating Local Rule 7.2(b)'s requirement that briefs "not exceed 40 ordinary typed pages," and the brief contains Plaintiff's attempt at a supplemental statement of disputed material facts, which pursuant to Local Rule 56.1 must be submitted as a separate document. More troubling is Plaintiff's cavalier attitude towards the facts of this case. Many of Plaintiff's factual assertions in both his Responsive Statement of Facts (Doc. No. 67-1) and his brief are wholly bereft of any citation to the record, and when Plaintiff does cite to the record, the cited portions often do not support his assertions. Some of these instances are mentioned in the above factual background section, but they are innumerable. Most egregious is Plaintiff's repeated assertion that he was suspended from the football team for five games in November 2016, when the only evidence in the record indicates that Plaintiff was suspended for five days. Because these deficiencies ultimately do not affect the disposition this Motion, the Court accepts Plaintiff's brief in its current state, but admonishes Plaintiff and his counsel against submitting future briefing of this quality.

outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" (quoting *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968))). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Anderson*, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in his favor. *Id.* at 255; *Matsushida*, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in his favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

Numerous issues are before the Court on Defendants' Motion. The Court begins by examining Plaintiff's core claims—that Defendants violated Title VI and the NJLAD by denying him playing time on the football team due to his race, by retaliating against him when he complained, and by subjecting him to a hostile school environment. Next, the Court considers whether Plaintiff can bring his NJLAD claims against Birnbohm, Cattani, and Walsh as individuals, and whether he can seek punitive damages under the NJLAD. After resolving these

NJLAD issues, the Court turns to Plaintiff's IIED claim. Finally, the Court assesses Plaintiff's Section 1983 claims.

### A.  Title VI & NJLAD Racial Discrimination—Football Team Participation

Plaintiff argues that Defendants violated Title VI and the NJLAD by limiting his participation on the Lenape High School varsity football team due to his race. (Pl. Brief at 31–32, 47–48). Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Similarly, the NJLAD provides that "[a]ll persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of race, creed, color, national origin . . . subject only to conditions and limitations applicable alike to all persons." N.J.S.A. 10:5–4. Defendants do not contest that they must comply with Title VI and the NJLAD.

Title VI only prohibits intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001). Plaintiff appears to rely on indirect evidence of discriminatory intent for his Title VI and NJLAD claims.[9] When assessing indirect evidence claims under Title VI, courts apply the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Xu Feng v. Univ. of Delaware*, 785 F. App'x 53, 55 (3d Cir. 2019) (citing *NAACP v. Med. Ctr., Inc.*, 657 F.2d 1322, 1336 (3d Cir. 1981)). The *McDonnell Douglas* framework is also used to analyze NJLAD. *L.L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 548 (3d Cir. 2017) (citing *Bergen Comm. Bank v. Sisler*, 723 A.2d 944, 954–55 (1999)).

---

[9] At one point in his Opposition Brief, Plaintiff claims that there is "quite substantial" direct evidence of racial discrimination in this case. (Pl. Brief at 30). However, Plaintiff does not elaborate on what that direct evidence is. Further, Plaintiff spends the remainder of his brief discussing indirect evidence of discrimination.

Under the *McDonnell Douglas* framework, "[p]laintiffs must first show a *prima facie* case, generally meaning that they suffered some adverse action under circumstances suggesting that the action was related to their membership in a protected group." *Xu Feng*, 785 F. App'x at 55. The precise formulation of the *prima facie* case "remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003). Further, the plaintiff's burden at this stage "'is not onerous.'" *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the plaintiff successfully makes out her *prima facie* case, "[t]he defendant must then give a 'legitimate, nondiscriminatory' reason for its actions." *Xu Feng*, 785 F. App'x at 55 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant provides such a reason, the plaintiff must then establish that this reason is pretextual. *Xu Feng*, 785 F. App'x at 55.

In order to make out his *prima facie* case, Plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse action by Defendants relating to his education; (3) despite being otherwise qualified; and (4) that there is "'a causal nexus between the harm suffered and [his] membership in a protected class.'" *L.L.*, 710 F. App'x at 548 (quoting *Anderson*, 621 F.3d at 275)) (emphasizing that Title VI and NJLAD plaintiffs do not need to show that similarly situated individuals outside the protected class were treated differently); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 554–55 (D.N.J. 2014).

Defendants do not contest that Plaintiff, as an African-American, is a member of a protected class. Further, they do not appear to contest that he suffered an adverse action by being denied playing time on the varsity football team, nor that Plaintiff was qualified to receive such playing time. Rather, Defendants contend that Plaintiff cannot establish the fourth element of his

*prima facie* case because there is no evidence that Plaintiff's participation on the varsity football team was limited due to his race. (Doc. No. 64-1 ("Def. Brief") at 10–13, 25).

In particular, Defendants argue that Plaintiff received limited playing time because another African-American player, J.K., was a better running back.[10] While Plaintiff concedes that J.K. was an "indispensable superstar[]," he maintains that he and J.K. were not actually competing for playing time. (Pl. Brief at 31). Although Plaintiff and J.K. were both running backs in the broad sense, J.K. was a two back while Plaintiff was a four back. (Doc. No. 67-3 at 36, 53). According to Plaintiff, two white players, R.S. and J.T., started ahead of him at the four back position. (*Id.*). While the records offers little on Plaintiff's playing ability relative to R.S. and J.T., Plaintiff's assertion that these white players received playing time at his expense is enough to establish the necessary causal nexus between his adverse treatment and his race. *See Stewart v. Rutgers*, 120 F.3d 426, 432 (3d Cir. 1997) (explaining that plaintiffs may satisfy the causation element of the *prima facie* case by showing that "nonmembers of the protected class were treated more favorably").[11]

Plaintiff's claim is further strengthened by several pieces of circumstantial evidence. First, by Plaintiff's account, the football coaching staff did not take any meaningful steps to address the racial slurs that white players were using in the locker room. (Doc. No. 67-3 at 26). Second, Murray and Noecker's own review indicated that, during the 2015 season, the percentage of starters on the varsity football team who were racial minorities was lower than the percentage of football players who were racial minorities and the percentage of Lenape students who were racial minorities.

---

[10] Defendants also offer this explanation as a legitimate non-discriminatory reason for Plaintiff's treatment. (Def. Brief at 25). Even when used this way, the argument still fails for the reasons set forth below.

[11] The substantial evidence Defendants have introduced about the relative playing abilities of J.K. and Plaintiff is simply irrelevant on this motion for summary judgment, as the Court must take Plaintiff's assertion that he was really competing for playing time with R.S. and J.T. as true.

(Doc. No. 64-4 at 28). And third, there is the parallel situation of S.K., who was also denied a starting position on the football team but was apparently sufficiently talented to earn an MVP award at an all-star bowl game. (Doc. No. 67-4 at 9). To be sure, none of these facts conclusively prove that the coaches were discriminating on the basis of race, but they are enough to create a causal nexus.

With respect to Plaintiff's NJLAD claim only, Defendants argue that Plaintiff has not sufficiently shown that he was denied any of Lenape High School's "accommodations, advantages, facilities, or privileges" as required by the statute. (Def. Brief at 16–18). Defendants assert New Jersey law does not recognize a constitutionally protected property interest in high school extracurricular activities, meaning that Plaintiff's participation on the Lenape football team was a "privilege" rather than a "right." (*Id.* at 17). Therefore, they believe that the NJLAD does not protect against racial discrimination in high school extracurricular activities.

This argument is nonsensical on its face; as Defendants appear to recognize, the NJLAD prohibits denial even of mere "privileges" on the basis of race. N.J.S.A. 10:5–4. Further, due to its remedial nature, the NJLAD is construed liberally. *Caraballo v. City of Jersey City Police Dep't*, 204 A.3d 254, 260 (N.J. 2019). And the New Jersey Supreme Court has made clear that the NJLAD applies in school settings. *L.W. ex rel. L.G. v. Toms River Reg. Schs. Bd. of Educ.*, 915 A.2d 535, 547 (N.J. 2007). As such, there is no reason the NJLAD should not apply to discrimination in extracurricular participation. *Cf. Stafford v. George Washington Univ.*, No. 18-2789, 2019 WL 2373332, at *10 (D.D.C. June 5, 2019) (finding that defendant's attempt to distinguish between rights and privileges was a "red herring" when analyzing Title VI claim).[12] Consequently,

---

[12] The Court notes again that Defendants do not assert that Plaintiff did not experience an "adverse action" as required by the second prong of the Title VI and NJLAD *prima facie* case. Because Defendants do not make this argument, the Court does not address it.

Plaintiff's Title VI and NJLAD claims alleging that he was denied playing time due to racial discrimination are sufficient to survive summary judgment.

### B.  Title VI Racial Discrimination—Other Claims

Plaintiff points to several other actions as giving rise to Title VI racial discrimination claims.[13] First, Plaintiff alleges that the coaching staff initially left him behind when the football team traveled to Moorestown on November 10, 2015. (Doc. No. 32 at ¶ 126). Second, Plaintiff asserts that the administration intentionally did not honor him as a varsity athlete during the 2015 Lenape football team banquet. (*Id.*). And third, Plaintiff alleges that his November 2016 five-day suspension from the football team was motivated by racial animus. (*Id.*).

In each instance, Defendants jump to the second step of the *McDonell Douglas* framework and offer a legitimate non-discriminatory reason for their actions, and Plaintiff fails to carry his burden of showing that Defendants' proffered explanation is pretextual. First, with respect to the school bus incident, Defendants maintain that Plaintiff chose to remain in the bathroom when the bus was scheduled to depart. (Def. Brief at 25). Indeed, Defendants' unrebutted evidence shows that on November 10, 2015, Plaintiff stayed in the bathroom for over fifty minutes, during which time he missed the bus to Moorestown. (Doc. No. 64-6 at 5). Plaintiff's belief that he was intentionally left is pure speculation.

Second, Defendants claim that Plaintiff was not honored at the football banquet through an administrative oversight. (Def. Brief at 25). While Coach McAneney reviewed the names of the players to be printed in the programs, he testified at his deposition that his review was not thorough, meaning that an error could occur. (Doc. No. 64-4 at 13). Plaintiff has not offered any evidence to

---

[13] It is unclear if Plaintiff truly wishes for these actions to serve as the basis for distinct Title VI claims, or only references them as evidence in support of his playing-time Title VI claim. For the sake of thoroughness, the Court assumes the former.

suggest that McAneney or any other Lenape personnel closely reviewed the banquet programs before printing. And while he points out that several other African-American players did not have asterisks next to their names in the program, he has not established that these players (or himself for that matter) met the requirements to earn varsity status during the 2015 season.

Third, Defendants contend that Plaintiff was suspended because he missed a practice on November 16, 2016 without an excuse and because of his disruptive outbursts during a team meeting on November 18, 2016. (*Id.* at 26). Plaintiff admits that on November 18, 2016, he got into verbal disagreements with M.H., N.A., and T.S., but contends that his suspension was undeserved because T.S. was the aggressor in their interaction. But two wrongs don't make a right—school officials may permissibly discipline a student for misbehavior even if another party was culpable for that misbehavior to some degree. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) (observing that "courts should refrain from second-guessing the disciplinary decisions made by school administrators").

Plaintiff further appears to suggest that it was unfair for him to be suspended while T.S. received no punishment, suggesting racial bias.[14] But Plaintiff and T.S. were not similarly situated—while  Plaintiff got into three different verbal disagreements that day, T.S. only argued with Plaintiff. And although Plaintiff claims T.S. called him the n-word during their altercation, none of the coaches or students Noecker interviewed supported that claim. (Doc. No. 64-6 at 7–8). Based on the available information, there was more reason to discipline Plaintiff than T.S.

Plaintiff also claims that he was treated more harshly in this instance than T.S. was when T.S. called Plaintiff the n-word in 2015. In that case T.S. received a three-day in-school suspension. (Doc. No. 64-5 at 8). While it is difficult to weigh the relative severity of a three-day in-school

---

[14] The record is unclear as to whether T.S. received any punishment, but the Court will assume that he was not punished for purposes of deciding this Motion.

suspension with a five-day suspension from the football team, whatever difference there may be is not so great as to set off any alarm bells. Consequently, Plaintiff has failed to produce any evidence from which a reasonable jury could find that Defendants' explanations for these incidents are pretextual, and thus his Title VI claims based upon them must be dismissed.

### C.   NJLAD Retaliation

The *McDonnell Douglas* framework also applies to NJLAD retaliation claims. *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 619 (N.J. 2013). In order to make out a *prima facie* case, a plaintiff must show that: (1) he was in a protected class; (2) he engaged in protected activity known to the defendant; (3) suffered an adverse consequence; and (4) there is a causal link between the protected activity and the adverse consequence. *Victor v. State*, 4 A.3d 126, 141 (N.J. 2010).

At this stage, Defendants do not contest that Plaintiff engaged in protected activity by filing complaints with the Lenape administration. Plaintiff asserts Lenape officials retaliated against him in the following ways due to his complaints: (1) by reducing his playing time on the football team; (2) suspending him in November 2015; (3) tolerating the racial harassment he experienced at the hands of the other players; and (4) suspending him from the football team in November 2016. (Pl. Brief at 45). Defendants contend that Plaintiff cannot show the necessary causal link between these incidents and his complaints. (Def. Brief at 18).[15]

At the summary judgment stage, plaintiffs can establish causality by either showing that "the temporal proximity between the protected activity and the adverse action is unusually suggestive" or that "the proffered evidence, looked at as a whole, [suffices] to raise the inference." *LeBoon v. Lancaster Jewish Comm. Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (internal quotations omitted). Such evidence may include "intervening antagonism or retaliatory animus,

---

[15] Again, Defendants fail to make any meaningful argument that these incidents are not adverse actions as required by the NJLAD. Consequently, the Court does not address this issue.

inconsistences in the [defendant's] articulated reasons for [the adverse action], or any other evidence in the record sufficient to support the inference retaliatory animus." *Id.* at 232–33.

Plaintiff fails to show that there is any relationship between his playing time on the football team and any of the complaints he filed with the Lenape administration. Plaintiff and his parents did not begin making any complaints to Lenape administrators until mid-September 2015, which resulted in the September 21, 2015 parents meeting. (Doc. No. 64-4 at 26). Yet Plaintiff's concern over his playing time arose earlier, during the preseason, when his participation in the team's intra-squad scrimmages was limited. (Doc. No. 64-3 at 38–39). While Plaintiff's participation on the varsity football team was limited, there is no indication that it grew any worse after he began filing complaints. Indeed, it even substantially improved for a time during the 2016 season, when Plaintiff started two games at running back, albeit in the place of an injured J.K. (Def. SUMF at ¶ 29).[16]

Nor does Plaintiff show any causal connection between his complaints and his November 2015 in-school suspension. There is some degree of temporal proximity: Walsh issued the suspension on November 10, 2015 (Doc. No. 67-6 at 59), only a few weeks after Plaintiff filed his complaints about his encounters with T.S. in the locker room and A.S. on Snapchat, and the day after Plaintiff's mother filed her complaint with Murray about the November 4 and November 5 locker room incident. However, temporal proximity is only sufficient to establish causality when it is "unusually suggestive of retaliatory motive." *D.V. ex rel. B.V. v. Pennsauken Sch. Dist.*, 247 F. Supp. 3d 464, 474 (D.N.J. 2017) (internal quotation omitted) (finding defendants' call to child services soon after a meeting where guardians complained about child's treatment was not

---

[16] Plaintiff does present evidence that the coaches threatened to deny him playing time if he took a knee during the playing of the national anthem before one game in the 2016 season. (Doc. No. 67-4 at 78). But this threat of retaliation for protesting does not establish that the coaches ever actually retaliated due to Plaintiff's complaints.

sufficient to establish causality because the child's uncle made comments at the meeting suggesting he showered with the child).

Here, Walsh suspended Plaintiff due to Plaintiff's actions in English class on November 4. Because even Plaintiff's account has him using his phone in English class and resisting Lopez's attempts to send him to the office, there is a non-retaliatory explanation for the timing of the suspension, just as in *D.V.* there was a non-retaliatory explanation for the call to child services.[17] And if Plaintiff could establish a causal nexus, his conduct in English class is still a legitimate, nondiscriminatory reason for his suspension that Plaintiff cannot show was pretextual.

By contrast, there is some evidence that Walsh and McAneney acted with retaliatory animus when they suspended Plaintiff from the football team. Plaintiff's November 22, 2016 HIB complaint indicates that he was suspended after a meeting on November 21 between Walsh, McAneney, Plaintiff, and Plaintiff's father. (Doc. No. 64-6 at 13). At the meeting, Walsh and McAneney were apparently angered by the actions of Plaintiff's father. (*Id.*). The extremely close temporal proximity of this meeting to Plaintiff's suspension is likely enough for Plaintiff to make out his *prima facie* case. But as discussed above, Defendants have offered a legitimate, nondiscriminatory explanation for this suspension, and Plaintiff has not produced sufficient evidence to show that this explanation is pretextual.

Finally, Plaintiff cannot establish causality between his complaints and the coaching staff's tolerance of the racial harassment he endured. Although Plaintiff contends that the other players began calling him "snitch Kenya" after he started complaining to the administration, he provides

---

[17] Also relevant is Walsh's apparent decision not to discipline Plaintiff after receiving a report from Assistant Coach Wojceichowski that Plaintiff had used the n-word on the team bus on October 31, 2015. (Doc. No. 67-6 at 78). If Walsh were truly trying to retaliate against Plaintiff, it seems likely that he would have used this incident as pretext for punishment. That Walsh did not punish Plaintiff for using the n-word suggests that he was acting in good faith when he suspended Plaintiff for the English class incident.

no evidence that the coaches' attitude ever worsened. There is no evidence that the coaches ever encouraged the white players to harass Plaintiff.[18] Indeed, Coach Lilley and Coach Hendricks actually intervened to help Plaintiff reassert his claim to his locker in November 2015. (Doc. No. 64-5 at 22–23). Without any additional evidence, Plaintiff cannot connect the dots between his complaints and the coaches' actions. Consequently, his NJLAD retaliation claim does not survive summary judgment.

### D.  Title VI and NJLAD—Hostile School Environment

Plaintiff further claims that Defendants subjected him to a hostile school environment due to his race in violation of Title VI and the NJLAD. Both statutes permit plaintiffs to sue for money damages to redress student-on-student harassment. *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011) (Title VI); *L.W.*, 915 A.2d at 947 (NJLAD).  For his Title VI claim, Plaintiff must show "'severe *or* pervasive' harassment based on [his] race and deliberate indifference to known acts of harassment." *L.L.*, 710 F. App'x at 549 (internal quotation omitted) (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017)). Similarly, on his NJLAD claim Plaintiff must show that (1) he suffered "discriminatory conduct that would not have occurred 'but for' [his race]," (2) that a similarly situated student would consider such conduct "severe or pervasive" and (3) "that the school district failed to reasonably address such conduct." *L.W.*, 915 A.2d at 547. Defendants contend that the discriminatory conduct Plaintiff suffered was

---

[18] Plaintiff appears to believe that the coaches intentionally tried to injure him during the 2016 preseason by rearranging the membership of the teams for the inter-squad scrimmage. (Pl. Brief at 23–24). However, the facts belie this claim; while the other team featured members of the varsity starting defense, Plaintiff's team featured members of the varsity starting offense. (Doc. No. 64-3 at 41–42, 47). Although one of these offensive starters was T.S., with whom Plaintiff had a history of animosity, there is no evidence that T.S. had tried to physically injure Plaintiff prior to this incident. And T.S.'s precise role in Plaintiff's injury is unclear; while T.S. did not make his block for Plaintiff, Plaintiff's injury was ultimately self-inflicted as he failed to make his cut, rolling his ankle in the process. (Doc. No. 67-3 at 55). Plaintiff's contentions regarding this incident are nothing more than unsupported speculation.

not severe or pervasive, and that in any event they responded reasonably. (Def. Brief at 15–16, 29–30).

> ### i.  Severe or Pervasive

To be severe or pervasive, student-on-student harassment must rise above routine schoolyard taunts so as to "deprive[] the victim of equal access to the school's educational opportunities." *Whitfield*, 412 F. App'x at 522; *L.W.*, 915 A.2d at 547. This is a demanding standard, meaning that even clearly objectionable behavior does not always make the cut. *See Whitfield*, 413 F. App'x 522 (affirming dismissal of Title VI claim where other students spat on African-American plaintiff, told her she smelled bad, scratched her, and more). Nevertheless, the use of the n-word is so plainly egregious that a single utterance can be enough to establish a hostile environment. *Castlebury*, 863 F.3d at 264–65; *see also L.L.*, 710 F. App'x at 549 (finding African-American student suffered hostile school environment under Title VI and the NJLAD where another student said the n-word in his presence).

In this case, Plaintiff asserts the he was called the n-word on at least two occasions, once in October 2015 and again in November 2016. The first instance is especially disturbing, as T.S. aggressively confronted Plaintiff while repeatedly calling him the n-word. (Doc. No. 64-5 at 2–3). Plaintiff was also present in the locker room when white players called other black players the n-word on numerous occasions. (*Id.*; Doc. No. 67–4 at 5). Besides the n-word, Plaintiff was called a variety of racial slurs, including "baby monk," grease monk," and "smelly monk," and was eventually also referred to as "snitch Kenya" after he complained about this harassment. (Doc. No. 67-3 at 24–26). This racial abuse continued for two full football seasons. (*Id.* at 24). While some of the examples Plaintiff provides were not obviously racially motivated, including the jersey incident and the November 4 and 5, 2015 locker room incident, they do not detract from his claims.

Consequently, the discriminatory conduct Plaintiff suffered meets the "severe or pervasive" standard under Title VI and the NJLAD.

### ii.  Unreasonable Response

In order to carry his burden on his Title VI claim, Plaintiff must show that Defendants responded with deliberate indifference to the acts of harassment he suffered. "[S]chool administrators are deemed to act with deliberate indifference 'only where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Whitfield*, 412 F. App'x at 522 (quoting *Davis*, 526 U.S. at 648) (alteration in original) (finding that school's response to racial harassment was not unreasonable where administrators disciplined students and implemented a racial sensitivity program).

For his NJLAD claim, Plaintiff must show that Defendants "knew or should have known of the harassment and failed to take action reasonably calculated to end the harassment." *L.W.*, 915 A.2d at 550. This determination requires "a fact-sensitive, case-by-case analysis" of "all relevant circumstances." *Id.* at 551.[19] While this standard is facially similar to the deliberate indifference standard, the New Jersey Supreme Court has emphasized that the NJLAD's requirement is less burdensome. *Id.* at 549.

Plaintiff and his parents complained many times about the harassing conduct of the white football players. The school's response varied. When Plaintiff complained about being called the n-word and "baby monk" in October 2015, the school promptly investigated and suspended the harassers, T.S. and A.S. (Doc. No. 64-5 at 7–8; 11). When other players barred Plaintiff from

---

[19] The New Jersey Supreme Court has supplied a non-exhaustive list of potentially relevant circumstances: "the students' ages, developmental and maturity levels; school culture and atmosphere; rareness or frequency of the conduct; duration of harassment; extent and severity of the conduct; whether violence was involved; history of harassment within the school district, the school, and among individual participants; effectiveness of the school district's response; whether the school district considered alternative responses; and swiftness of the school district's reaction." *L.W.*, 915 A.2d at 551.

accessing his locker, football coaches swiftly intervened to restore Plaintiff's access; when Plaintiff and his mother complained, the school launched an investigation. (*Id.* at 25). And when Plaintiff complained that T.S. called him the n-word in November 2016, the school investigated again, this time finding insufficient evidence to substantiate Plaintiff's allegation. (Doc. No. 64-7 at 7, 11). But these actions do not tell the full story.

While Lenape took steps to address specific instances of harassment by disciplining specific individuals, it never took meaningful action to address the background harassment that pervaded the locker room. When Mr. and Mrs. Williams, alongside other parents, initially complained to school officials about the racial slurs being used in the locker room at the September 2015 meeting, those officials brushed their concerns aside;[20] while the school launched an investigation after the meeting, it focused only on whether the coaches were awarding playing time in a racially discriminatory way. (Doc. No. 64-4 at 28). Further, the school did not investigate the locker room atmosphere until Plaintiff complained about the Snapchat incident over a month later, at which time the investigators concluded that it was "comfortable and non-offensive," despite finding widespread evidence of the use of racial slurs, (Doc. No. 64-5 at 18), including use of the n-word, (Doc. No. 67-3 at 13).

Unlike in *Whitfield*, the school did not implement any sort of new racial sensitivity program in response to the incidents of racial abuse it learned of. The school did have an outside professional address the team on mutual respect, but this outside professional had apparently addressed the team in the past and would have given this address in 2015 whether or not Plaintiff had ever complained of racial harassment. (Doc. No. 64-5 at 15; Doc. No. 67-3 at 77). In light of

---

[20] Defendants contest this characterization of the September 2015 meeting, and contend that the parents only raised concerns about playing time. While Defendants are welcome to make this argument at trial, at this stage the Court must assume the truth of Plaintiff's account.

this evidence, a reasonable jury could find that the school's response was unreasonable under both Title VI and the NJLAD. *See DiStiso v. Cook*, 691 F.3d 226, 245 (2d Cir. 2012) (finding that principal could be found to have been deliberately indifferent to complaints of racial name-calling where he did nothing more than speak with a teacher); *Mason v. Roman Catholic Archdiocese of Trenton*, No. 18-10733, 2019 WL 1320299, at *5 (D.N.J. Mar. 22, 2019) (concluding that it would be possible to find school administrators acted unreasonably where they responded to act of racial harassment only by issuing a suspension to one student and did not implement any sort of new racial sensitivity program). Consequently, Plaintiff's hostile school environment claims survive summary judgment.

### E.  Title VI and NJLAD Individual Liability

Plaintiff brings his Title VI and NJLAD not only against the Board but also against Birnbohm, Cattani, and Walsh in their individual capacities. There is no individual liability under Title VI, so those claims must be dismissed. *Whitfield*, 412 F. App'x at 521. The NJLAD does provide for individual liability, but only if the defendant aids, abets, incites, compels, or coerces the underlying violation. N.J.S.A. 10:5–12(e). To establish an aiding and abetting claim under the NJLAD, the plaintiff "must demonstrate that the defendants: "(1) aided another in performing a wrongful act that caused an injury; (2) were aware of their role in the illegal activity at the time it was committed; and (3) knowingly and substantially assisted with the main violation." *Yuli v. Lakewood Bd. of Educ.*, No. 13-4617, 2014 WL 5308187, at *9 (D.N.J. Oct. 16, 2014). Supervisors may be held liable for their own misconduct even if they do not "aid" another's wrongdoing. *Rowan v. Hartford Plaza Ltd.*, No. A-0107-11T3, 2013 WL 1350095, at *7 (N.J. Super. Ct. App. Div. Apr. 5, 2013). Nevertheless, the plaintiff must still show that the supervisor engaged in "active

and purposeful conduct" sufficient to trigger aiding and abetting liability. *Cicchetti v. Morris Cty. Sheriff's Office*, 947 A.2d 626, 646 (N.J. 2008) (internal quotation omitted).

In this case, Plaintiff has produced enough evidence to allow two of his NJLAD claims to survive summary judgement: (1) that he was denied playing time on the Lenape football team due to his race; and (2) that he suffered a hostile school environment due to student-on-student harassment. Defendants contend that there is insufficient evidence to find that Birnbohm, Cattani, and Walsh aided and abetted these acts. (Def. Brief at 19). Plaintiff responds that these three may be held liable because they failed to properly address Plaintiff's complaints of racial harassment. (Pl. Brief at 50).[21]

The key issue is whether Defendants "knowingly and substantially" aided in either denying Plaintiff playing time or subjecting him to a hostile environment. Plaintiff has produced no evidence that Birnbohm, Cattani, or Walsh ever knowingly or substantially aided the football coaches' efforts to deny Plaintiff playing time. As such, this claim against them is dismissed.

However, a supervisor's repeated failure to take prompt action to end known harassment does constitute aiding and abetting under the NJLAD. *Dici v. Pennsylvania*, 91 F.3d 542, 553 (3d Cir. 1996) (construing nearly identical provision of the Pennsylvania Human Relations Act); *Failla v. City of Passaic*, 146 F.3d 149, 158 n.11 (3d Cir. 1998) (citing *Dici* in NJLAD case). The evidence shows that Birnbohm, Cattani, and Walsh were supervisory employees and that they were aware that Plaintiff was suffering racial harassment in the locker room. All three repeatedly failed to take the steps necessary to curtail the locker room harassment. Walsh's actions were especially

---

[21] Plaintiff also asserts that Birnbohm, Cattani, and Walsh are liable because they were involved in the suspension issued to Plaintiff for the November 2015 English class incident and Plaintiff's November 2016 suspension from the football team. (Pl. Brief at 50). Yet the English class suspension did not lead to a reduction in Plaintiff's playing time, nor did it contribute to the hostile environment he was exposed to, and consequently does not provide a basis for aiding and abetting liability. And as discussed above, Defendants have provided a valid explanation for the November 2016 suspension, meaning that it is also divorced from the potentially violative conduct.

significant, as, by Plaintiff's account, he learned of the harassment at the September 2015 parents meeting, only to deliberately ignore the complaints about racial slurs in the locker room. (Doc. No. 64-4 at 26; Doc. No. 67-4 at 16, 52). And all three appear to have stood by Noecker and Murray's conclusion that the locker room had a comfortable atmosphere, even as Plaintiff and his parents continued to complain. Consequently, Plaintiff's hostile school environment NJLAD claim survives summary judgment.

### F.  NJLAD Punitive Damages

Defendants argue that Plaintiff cannot maintain his claim for punitive damages under the NJLAD. Punitive damages are available "only in the event of actual participation by upper management or willful indifference." *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 464 (N.J. 1993); *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 461 (D.N.J. 2009) (finding punitive damages claim could survive summary judgment where there was evidence upper management ignored a recommendation to impose punishment on harasser). As discussed above, there is evidence that Defendants turned a blind eye to Plaintiff's initial complaint of locker room harassment and never acted to fully address the problem, despite his repeated complaints of abuse. Consequently, Plaintiff's claim for punitive damages survives summary judgment.

### G.  IIED

Defendants contend that Plaintiff's IIED claim must be dismissed because the Board is immunized from liability under N.J.S.A. 59:2–10 and because Plaintiff has failed to make out his *prima facie* case. (Def. Brief at 21–23). Plaintiff does not clearly respond to these arguments in his brief, leading the Court to conclude that he has abandoned his IIED claim, warranting its dismissal. *See Bernard v. Webb-McRae*, No. 17-7030, 2020 WL 1329934, at *2 (D.N.J. Mar. 23, 2020)

(dismissing claims when plaintiff failed to respond to defendant's arguments on summary judgment motion). Further, Plaintiff would not prevail even if he had chosen to respond.

To state a claim for IIED under New Jersey law, a plaintiff must allege that the defendant (1) acted intentionally or recklessly and (2) outrageously, and (3) proximately caused (4) severe distress. *Buckley v. Trenton Saving Fund Soc*., 544 A.2d 857, 863 (1988). Regarding the first element, the defendant "must intend both to do the act and to produce emotional distress." *Id*. Next, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. (quoting Restatement (Second) of Torts § 46 cmt. d).[22] If the Court determines that the defendant's actions proximately caused the plaintiff's emotional distress, the plaintiff must then show the distress suffered was "so severe that no reasonable man could be expected to endure it." *Buckley*, 544 A.2d 857, 863 (quoting Restatement (Second) of Torts § 46 cmt. j).

Under the New Jersey Tort Claims Act, public entities, such as the Board, cannot be held liable for IIED committed by public employees. N.J.S.A. 59:2–10; *Bowman v. Rowan Univ.*, 18-4239, 2018 WL 6617831, at *6 (D.N.J. Dec. 18, 2018). Further, none of Birnbohm, Cattani, or Walsh's actions were so "extreme" or "outrageous" as to meet the demanding standard for an IIED claim. Thus, this claim is dismissed with respect to all Defendants.

---

[22] *See also 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc*., 547 A.2d 1134, 1145 (N.J. Super. Ct. App. Div. 1988) ("The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 46 cmt. d)).

### H.  Section 1983 Claim

Section 1983 "provides a remedy for the violation of rights created by federal law." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). To make out a Section 1983 claim, "a plaintiff must demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Id*. While Plaintiff never clearly explains what federal right he was deprived of, his briefing suggests that he is bringing a Fourteenth Amendment Equal Protection Clause disparate treatment claim. (Pl. Brief at 35–39).[23] As with Plaintiff's Title VI and NJLAD claims, the *McDonnell Douglas* framework applies. *L.L.*, 710 F. App'x at 550 (citing *Stewart*, 120 F.3d at 432). Plaintiff's Amended Complaint states Section 1983 claims against Walsh and the Board.[24]

#### i.   *Individual Liability Claim Against Walsh*

Although Plaintiff states that he is pursuing Section 1983 claims against all of the individual defendants in this case, he only advances any identifiable contentions with respect to Walsh.[25] (Pl. Brief at 36–37). In particular, Plaintiff contends that Walsh violated the Constitution by: (1) suspending Plaintiff for disrupting his English class in November 2015; (2) condoning Coach McAneney's suspension of Plaintiff for five days in November 2016; and (3) controlling an athletic department that denied Plaintiff and other African-American players playing time. (*Id.*).

---

[23] At one point, Plaintiff asserts that he is bringing a claim "under the Fourteenth Amendment's Process [sic] Clause." (Pl. Brief at 39). However, Plaintiff fails to elaborate on the nature of the alleged due process violation, leaving the Court at a loss as to what he is referring to.

[24] In the first instance, Defendants argue that Plaintiff's Section 1983 claims should be dismissed for failure to state a claim. (Def. Brief at 32–33). In this Circuit, it is permissible for defendants to assert the defense of failure to state a claim on a motion for summary judgment. *See Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 223 n.8 (3d Cir. 2015). However, in its prior Opinion, the Court found that Plaintiff had plead enough to state a Section 1983 claim. *Williams v. Lenape Bd. of Educ.*, 17-7482, 2018 WL 916364, at *7 (D.N.J. Feb. 16, 2018). As such, the Court will not revisit the issue here.

[25] Plaintiff also asserts that Assistant Principal Murray's failure to properly investigate Plaintiff's complaints violated the Constitution. (Pl. Brief at 37). Whatever the merits of this claim, Murray is not a defendant in this case, meaning that Plaintiff cannot press this claim against him.

As is extensively discussed above, Plaintiff has not met his burden under the *McDonnell Douglas* framework of showing that the November 2015 or November 2016 suspensions were issued due to racial animus but has met his burden with respect to the denial of playing time. Thus, the key issue is whether Walsh is individually liable under Section 1983 for his role in supervising the football coaches who decided not to play Plaintiff.

Section 1983 plaintiffs cannot prevail on a theory of *respondeat superior*; rather, they must show that the defendant was personally involved in violating their rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (holding that plaintiffs must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution"). "Personal involvement 'can be shown through allegations of personal direction or of actual knowledge and acquiescence.'" *Hayes v. Gilmore*, 2020 WL 550735, at *2 (3d Cir. Feb. 4, 2020) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). The Third Circuit's "knowledge and acquiescence" caselaw requires a defendant to have actual, personal knowledge of the violation— constructive knowledge does not suffice. *See Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015); *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).

Walsh initially learned of Plaintiff's complaints of an unfair allocation of playing time on September 20, 2015. (Doc. No. 64-4 at 26). In response, he had McAneney set up a meeting with the parents of African-American players to fully hear these complaints. (*Id.*). While Walsh ignored the complaints of racial harassment in the locker room, he reported the complaints of discrimination in playing time, prompting Murray and Noecker to investigate. (*Id.* at 26, 28). During this investigation, Murray and Noecker interviewed three African-American football players, including Plaintiff, none of whom affirmatively indicated that they were being denied

playing time for racist reasons. (*Id.* at 40–42). As such, Murray and Noecker found the coaches were not awarding playing time on the basis of race. (*Id.* at 28).

While Walsh arguably had knowledge of the equal protection violation after hearing Plaintiff's complaints in September 2015, he did not acquiesce to the violation because he reported it to other administrators and cooperated in the ensuing investigation. Further, there is no evidence that Plaintiff complained to Walsh about his playing time after Murray and Noecker released their investigation report. Consequently, Plaintiff cannot demonstrate that Walsh simultaneously had actual knowledge of the alleged equal protection violation and acquiesced to it, and thus this claim fails.

### ii. *Monell Claim Against the Board*

To hold a municipal entity, such as a school board, liable under Section 1983, the plaintiff must demonstrate that her rights were violated by a policy or custom of the entity and that such policy or custom was "the moving force" behind the deprivation of her constitutional rights. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). "A policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues a final proclamation, policy, or edict." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation omitted). A municipal custom, although lacking the formal approval of a policy, refers to those official practices which are "so permanent and well settled as to constitute . . . the force of law." *Monell*, 436 U.S. at 694. Plaintiff contends that the Board is liable under Section 1983 because the football coaches had a policy of preferencing white students for playing time and because Lenape's administrators were inadequately trained. (Pl. Brief at 38–40).

Under the Lenape Regional High School District's policies, Coach McAneney had final decision-making responsibility for playing time on the Lenape football team. (Doc. No. 64-8 at 7, 12). As such, he is a "policymaker" for *Monell* liability purposes. Further, "a challenged action can be considered the result of policy or custom 'where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.'" *Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x 194, 198 (3d Cir. 2018) (quoting *Natale*, 318 F.3d at 584). As it was McAneney who decided not to play Plaintiff, the alleged constitutional violation was perpetrated by the relevant policymaker, and thus this claim survives summary judgment.

Plaintiff's failure to train theory does not fare as well. Under certain circumstances, a municipality's failure to properly train its employees and officers can amount to a "custom" that will trigger liability under Section 1983. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). When a plaintiff alleges that a policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons whom those employees will come into contact." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotation omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). Finally, the plaintiff must show a "causal nexus" between the training deficiency and her injury. *Thomas*, 749 F.3d at 226 (internal quotation omitted) (explaining that "the causation inquiry focuses on whether the injury could have been avoided had the employee been trained under a program that was not deficient in the identified respect" (internal quotation omitted)).

Plaintiff offers no more than a list of the various ways he believes the Lenape administrators failed in their handling of his case and a conclusory assertion that these failures show a lack of training. (Pl. Brief at 40). This showing is insufficient. First, Plaintiff has not actually identified any specific training that he believes the Lenape administrators should have received. Second, he has not presented evidence that there was a pattern of similar violations demonstrating deliberate indifference to any lack of training. And third, Plaintiff has produced no evidence that the constitutional injury he allegedly suffered in this case—a denial of playing time due to his race—could have been avoided by additional training. Consequently, Plaintiff's failure to train theory fails.

## V.        CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**; specifically, Plaintiff's NJLAD retaliation claim is **DISMISSED WITH PREJUDICE**; Plaintiff's IIED claim is **DISMISSED WITH PREJUDICE**; Plaintiff's Title VI claims against Birnbohm, Cattani, and Walsh are **DISMISSED WITH PREJUDICE**; Plaintiff's Section 1983 claims against Birnbohm, Cattani, and Walsh are **DISMISSED WITH PREJUDICE**; Plaintiff's NJLAD and Title VI racial discrimination claims, NJLAD and Title VI hostile school environment claims, NJLAD claims against Birnbohm, Cattani, and Walsh, claim for punitive damages under the NJLAD, and Section 1983 claim against the Board survive as discussed above.


Dated: 5/4/2020                                      /s/ Robert B. Kugler
                                                     ROBERT B. KUGLER
                                                     United States District Judge